**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tony Goldtooth,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Office of Navajo and Hopi Indian Relocation,<br><br>　　　　　Defendant. | No. CV-22-08120-PCT-DLR<br><br>**ORDER** |

Plaintiff Tony Goldtooth seeks judicial review of an administrative decision by Defendant Office of Navajo and Hopi Indian Relocation ("ONHIR"), denying Plaintiff relocation benefits under the Navajo-Hopi Settlement Act. (Doc. 16.) Before the Court are the parties' cross-motions for summary judgment, which are fully briefed. (Docs. 16, 19, 20, 23.) For the reasons that follow, Plaintiff's motion is denied, and Defendant's cross-motion is granted.

**I.     BACKGROUND**

　　**A.  The Settlement Act**

In 1974, Congress enacted the Navajo and Hopi Land Settlement Act ("Settlement Act"), authorizing the partition of the Joint Use Area between the Hopi and Navajo Tribes. Pub. L. No. 93-531, 88 Stat. 1712 (1974) (formerly codified as amended at 25 U.S.C. §§ 640d to 640d-31); *see Clinton v. Babbitt*, 180 F.3d 1081, 1083–86 (9th Cir. 1999). This created the Hopi Partition Land ("HPL") and Navajo Partition Land ("NPL"). *Id.* The

1   Settlement Act also created ONHIR, an independent federal agency, to provide relocation
2   benefits to any head of a household whose household was forced to relocate because of the
3   partition. 25 U.S.C. § 640d-14(b). Plaintiff seeks these benefits.

### B. Facts and Procedural History

Plaintiff is an enrolled member of the Navajo Nation. (AR. 22.) On July 22, 2009, Plaintiff filed an Application for Relocation Benefits. (AR. 19.) On the application, Plaintiff stated that he was raised by his grandmother, Mary Goldtooth, who lives on the HPL, but that when he got married in 1965, he moved from the HPL to his wife's residence in New Mexico. (AR. 18.) Plaintiff indicated that he had been a member of the White Cone, Indian Wells Chapter of the Navajo Nation since 1960. (AR. 14.) Plaintiff also stated that he was living in Many Farms, Arizona on December 22, 1974, because he "was a full time student at Navajo Community College." (AR. 16–17.) Many Farms is not located on HPL. (*Id.*)

On March 1, 2012, Plaintiff mailed a letter to ONHIR, providing more information relating to his application for benefits. (AR. 38.) Plaintiff stated that he was drafted into the U.S. Army from January 1966 to January 1968. (*Id.*) While in the army, Plaintiff "went home often to help out [his] grandparents and went back home as often as [he] was able to." (*Id.*) From around 1971 to 1975, Plaintiff attended Navajo Community College, before beginning his employment at the college in 1976. (*Id.*) Plaintiff remained employed there as of March 1, 2012. (*Id.*)

ONHIR denied Plaintiff's application on February 19, 2013. (AR. 40.) Plaintiff appealed the denial on April 8, 2013, and a hearing was held before an Independent Hearing Officer ("IHO") on April 15, 2016 (AR. 44, 79.) At the hearing, Plaintiff testified that he was raised in a hogan on the HPL near the residence of his uncle, Justin Lewis. (AR. 83.) Plaintiff lived at the homesite with his parents, grandparents, aunt, and uncle. (*Id.*) Plaintiff's parents raised him until he was about 10 to 12 years-old, when his mother fell ill and was taken to a sanatorium in Tucson. (*Id.*) Thereafter, Plaintiff's grandmother, Mary Goldtooth, raised him on the HPL. (*Id.*)

Plaintiff also testified that he got married in 1965, before being drafted into the military in 1966. (AR. 90.) After Plaintiff was discharged in 1968, he lived with his wife's family in Shiprock, New Mexico, though he would return to HPL to help his grandmother with herding, building fires, branding, and caring for her livestock. (*Id.*) After a year and a half of this arrangement, Plaintiff started training as a machinist in Shiprock. (AR. 92.) The training lasted a year, before he was hired as an employee. (*Id.*) He worked as a machinist in Shiprock until 1973. (*Id.*)

When asked how much time Plaintiff spent back at his grandmother's home, Plaintiff replied, "[h]ome is where the livestock is" and that he was able to return "maybe couple times a month or sometimes maybe three times." (AR. 93.) Plaintiff testified that in the fall of 1973, he quit his job as a machinist and went to Navajo Community College in Many Farms, Arizona. (AR. 94.) At first, Plaintiff, his wife, and three children lived with one of Plaintiff's classmates in Many Farms. (AR. 95.) Plaintiff testified that he and his family would return to his grandmother's home "often because we were just residing with somebody, we [were] living in their mobile home." (*Id.*) Later, though, Plaintiff was able to purchase a mobile home through the GI Bill. (*Id.*) Plaintiff's mobile home was located in Many Farms, Arizona. (*Id.*) When asked how frequently Plaintiff returned to his grandmother's home after purchasing the mobile home, Plaintiff replied, "[W]e went back to grandma and spen[t] the weekend, in the summer, we were here in the summer, every weekend and sometimes, once in a while I didn't [have] class so we stayed there." (AR. 95.) When Plaintiff graduated in 1975, he returned home to help his grandma. Plaintiff then secured a position teaching at Navajo Community College in Shiprock in fall of 1976. (AR. 97–98.) Plaintiff brought the mobile home with him and his family to Shiprock. (AR. 107.) Plaintiff testified that after he started teaching at the college, he was "obligated to go back [to his grandma's] where the livestock [was], so [he] went back and took care of [his] grandma's necessit[ies]." (AR. 99.)

On cross examination, when ONHIR's counsel asked Plaintiff whether he was originally from the Teesto Chapter, Plaintiff confirmed that he was. (AR.103.) ONHIR's

counsel then referred Plaintiff to a Youtube video in which Plaintiff was interviewed as an employee of Dine College (formerly known as Navajo Community College). (*Id.*) ONHIR's counsel noted that in the video, Plaintiff identified himself as being from White Cone, instead of Teesto. (AR. 104.) ONHIR's counsel also noted that Plaintiff identified himself as being part of the White Cone chapter in his Application for Relocation Benefits. (*Id.*) Then, ONHIR's counsel asked Plaintiff whether he was a member of the White Cone chapter, to which Plaintiff responds, "I never attend[ed] any meeting. I [have] never been there." (AR. 105.) ONHIR's counsel also inquired into whether there was a livestock reduction in 1974. (AR. 119.) Plaintiff confirmed that there was a reduction and that his family sold a lot of their livestock that year. (*Id.*)

The IHO issued "Findings of Fact, Conclusions of Law and Decision" on June 21, 2016. (AR. 224.) As part of the decision, the IHO also issued "Credibility Findings." (AR. 228.) The IHO found, "[Plaintiff's] testimony about his visitation to Justin Lewis's residence from 1973 on is exaggerated and is not credible. [Plaintiff's] testimony about his education, training, and employment is credible." (*Id.*) The IHO then determined that Plaintiff was ineligible for relocation benefits, stating:

> On December 22, 1974, [Plaintiff] was a legal resident of Many Farms, in an area which was partitioned for the use of the Navajo Indians. At that time, he and his family were living in a mobile home that [Plaintiff] purchased and placed at Many Farms and, on that date, [Plaintiff] was attending college there, full-time. On December 22, 1974, [Plaintiff] was not a legal resident of Justin Lewis's residence in Teesto on HPL Land as his visits there were irregular and primarily social. . . . Pursuant to the requirements of the Act and the ONHIR regulations, [Plaintiff] was not a legal resident of any area that was partitioned for the use of a Tribe of which he is not a member as of December 22, 1974.

(AR. 230–31.)

The IHO then explained that "[Plaintiff] relies on his visitation to the residence of Justin Lewis to support his claim for . . . benefits. From the time applicant was discharged from the Army in 1968 and until a time beyond the date of passage of the Act, [Plaintiff] visited Justin Lewis at his residence to help with shearing and branding at times, to

- 4 -

participate in ceremonies there, and to visit family members, especially his grandmother." (AR. 231.) However, the IHO found that "several factors militate[d] against finding that Justin Lewis's residence was [Plaintiff's] legal residence." First, "[t]he Lewis family participated in Livestock Reduction where they sold 'a lot' of livestock, therefore reducing the need for help in branding or shearing." (AR. 231.) Second, "[Plaintiff's] grandmother . . . had two residences on NPL where she kept her livestock and, even if those camps were seasonal, applicant's visitation to his grandmother occurred on NPL, not at Justin Lewis's residence." (AR. 231–32.) Third and "[m]ost importantly, from 1973, [Plaintiff] had his own residence in the form of a mobile home that he bought through the GI Bill and which he first placed in Many Farms and then in Shiprock and in which his family lived—full-time." (AR. 232.)

The IHO noted that although Plaintiff may "have a great affinity for his grandmother and may have had substantial feelings about his ancestral home . . . none of that rises to the level of retaining a legal residence on HPL when the objective indicia of residence shows that [Plaintiff] really lived in Many Farms and Shiprock." The IHO further stated that Plaintiff's description of the frequency of his visits to Lewis's homesite were exaggerated, "but, beyond that, if the primary purpose of those visits was to see [his grandmother], [she] was not there since she was residing at her own home on NPL." (AR.232–33.) Further, although Plaintiff testified that "home is where your livestock is," the Livestock Reduction Program reduced Plaintiff's livestock. (AR. 233.) And Plaintiff's grandmother kept her livestock on NPL, so any visits to help his grandmother with her livestock would have been to the NPL, not HPL. (*Id.*)

The IHO also explained that the Plaintiff's "state of mind" was a factor in deciding legal residence. The IHO noted:

> Justin Lewis's residence is in the Teesto Chapter. [Plaintiff] represented himself as a Whitecone Chapter resident since 1960 in his application and when he was interviewed for a Youtube video of his life. If [Plaintiff] did not identify himself as a Teesto Chapter member, one must be skeptical of any claim he makes about being a legal resident at Justin Lewis's home . . . on HPL.

- 5 -

(AR. 233–34.) The IHO concluded that "all of the objective indicia of residence show[] that, after [Plaintiff] bought a mobile home, his residence was where he put the mobile home, in Many Farms and in Shiprock" and, therefore, Plaintiff had not proven that he retained a legal residence on HPL. (AR. 234.)

## II. LEGAL STANDARD

### A. Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact and, after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56. When reviewing agency action under the Administrative Procedure Act ("APA"), there are no disputed facts that a district court must resolve. *Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). The administrative agency—not the Court—is the fact-finder. *Id.* The Court's job is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* Thus, summary judgment is "an appropriate mechanism for deciding the legal question of whether [ONHIR] could reasonably have found the facts as it did." *Id.* at 770.

### B. APA Standards of Review

The APA governs the Court's review of the IHO's decision under the Settlement Act. *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 914 (9th Cir. 1995). Under the APA, the Court must uphold agency action unless it is arbitrary, capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A), (E); *see also Bedoni v. Navajo-Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1122 (9th Cir. 1989).

An ONHIR decision satisfies the "arbitrary and capricious" standard if "the agency examine[s] the relevant data and articulate[s] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Hopi Tribe*, 46 F.3d at 914 (internal quotation marks omitted). The scope of review under this standard is narrow and "a court is not to substitute its judgment for that of the agency." *Id.* (internal

quotation marks omitted.) Still, if ONHIR "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or product of agency expertise," then its decision is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Similarly, a decision is arbitrary and capricious if ONHIR fails to follow its own precedent or fails to provide a sufficient explanation for doing so. *See Andrzejewski v. Fed. Aviation Admin.*, 563 F.3d 796, 799 (9th Cir. 2009).

An agency's decision satisfies the "substantial evidence" standard if it is supported by "such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The standard requires "more than a mere scintilla but less than a preponderance" of evidence. *Orteza v. Shalala*, 50 F.3d 748, 749 (9th Cir. 1995). The Court's review is highly deferential. *Sacora v. Thomas*, 628 F.3d 1059, 1068 (9th Cir. 2010). The IHO is responsible for determining credibility, resolving conflicts in the testimony, and resolving ambiguities in the record. *Magallanes*, 881 F.2d at 750. Where the evidence is susceptible to more than one rational interpretation, the Court must uphold ONHIR's decision. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

### C. The Settlement Act and Associated Regulations

A Navajo applicant is eligible for benefits if he was a legal resident of the HPL as of December 22, 1974, and was a head of household at the time he moved off of the HPL. 25 C.F.R. §§ 700.147(a), 700.69(c). The applicant bears the burden of proving residence and head of household status. *Id.* § 700.147(b). Only the residency element is at issue in this case.

Determining an applicant's residence "requires an examination of a person's intent to reside combined with manifestations of that intent." 49 Fed. Reg. 22,278; *Charles v. Off. of Navajo & Hopi Indian Relocation*, 774 Fed. Appx. 389, 390 (9th Cir. 2019). Manifestations of intent may include ownership of livestock, ownership of improvements,

grazing permits, homesite leases, public health records, medical records, school records, employment records, birth records, Joint Use Area Roster, and any other relevant data. *See* 49 Fed. Reg. 22,278. That said, "[a]n individual who was, on December 22, 1974, away from the land partitioned to the Tribe of which he/she is not a member may still be able to prove legal residency." 49 Fed. Reg. 22,277. For instance, under the "temporarily away" exception, "[i]f Plaintiff left the HPL temporarily to pursue higher education or employment, Plaintiff can still establish his legal residency by showing substantial and recurring contacts with his home within the HPL." *Tso v. Off. of Navajo & Hopi Indian Relocation*, No. CV-17-08183-PCT-JJT, 2019 WL 1877360, at *4 (D. Ariz. Apr. 26, 2019).

### III.   DISCUSSION

Plaintiff makes two arguments: (1) the IHO's credibility finding as to Plaintiff's testimony is arbitrary and capricious and unsupported by substantial evidence and (2) the IHO's residency determination is arbitrary and capricious and unsupported by substantial evidence. The Court addresses each argument in turn.

#### A. The IHO's Credibility Determination Is Supported by Substantial Evidence and Is Not Arbitrary and Capricious

"When the decision of an [IHO] rests on a negative credibility evaluation, the [IHO] must make findings on the record and must support those findings by pointing to substantial evidence on the record." *Ceguerra v. Sec'y of Health & Hum. Servs.*, 933 F.2d 735, 738 (9th Cir. 1991) (citation omitted). Although an IHO's credibility findings are entitled to substantial deference, the Court will only "defer to credibility findings that are fairly supported by the record and supported by *specific and cogent reasons* for rejection of the testimony." *Hossain v. Immigr. & Naturalization Serv.*, 7 Fed. Appx. 760, 760 (9th Cir. 2001). "The IHO may set forward [credibility reasoning] either in the formal credibility determination or in the body of the decision." *Begay v. Off. of Navajo & Hopi Indian Relocation*, No. CV-20-08102-PCT-SMB, 2021 WL 4247919, at *4 (D. Ariz. Sept. 16, 2021). In assessing credibility, an IHO may "adequately find a lack of credibility based on internal inconsistencies in a witness's testimony" or "the totality of the record." *Id.* (citing

*N.L.R.B. v. Doral Bldg. Services, Inc.*, 666 F.2d 432, 435 (9th Cir. 1982)).

Here, the IHO found that Plaintiff's testimony about his education, training, and employment was credible, but that "[his] testimony about his visitation to Justin Lewis's residence from 1973 on [was] exaggerated and [was] not credible." (AR. 228.) The IHO's decision provides a rational connection between the facts in the record and why he chose to discredit Plaintiff's testimony, providing several explanations for doing so in the body of his decision.

First, the IHO pointed to Plaintiff's claim that he would visit HPL to see his grandmother and to help care for the livestock. The IHO noted that Plaintiff's testimony is contradicted by the fact that his grandmother was enumerated and resided at her home on NPL, not HPL. (AR. 182.) And despite claiming that "home is where the livestock is," Plaintiff also admitted that the Livestock Reduction Program significantly reduced the family's livestock in 1974, thereby reducing his responsibility to help care for livestock. It was rational for the IHO to find that these two facts in the record controverted Plaintiff's explanation for his visits to HPL.

Second, the IHO noted that although Justin Lewis's residence—which Plaintiff claims to be a resident of—is in the Teesto chapter of the Navajo Nation, Plaintiff identified himself as being from White Cone both in his Application for Relocation Benefits and in a Youtube video for Dine College. When asked about which chapter he's from on cross-examination, Plaintiff claimed to be from Teesto. Then, when he was referred to his Application and Youtube video, Plaintiff testified that he never attended any White Cone meetings. It was rational for the IHO to find discrepancies between the evidence and Plaintiff's testimony. Further, this is a discrepancy that is material given that chapter membership coincides with residency. It is reasonable to expect that someone residing in Teesto would identify themselves as being a Teesto chapter resident. Yet Plaintiff did not. Instead, the evidence shows that on two prior occasions, including one where Plaintiff addressed ONHIR directly, he claimed to be from White Cone. Then, when confronted on cross examination, Plaintiff attempted to walk down those two prior claims. It was rational

for the IHO to use this conflict in Plaintiff's statements as a reason to discredit Plaintiff's testimony about his residency on HPL. *See Begay*, 2021 WL 4247919, at *5 ("Extremely relevant [in credibility assessments] are the Plaintiff's own statements to ONHIR.").

Third, the IHO pointed out that objective indicia indicated Plaintiff's legal residence was not on HPL at Justin Lewis's residence. The IHO noted that legal residence for the purposes of the Act is "where [Plaintiff's] primary residence exists, where [Plaintiff] conducts his business, and where [Plaintiff] raises his family." (AR. 233.) The IHO found that Plaintiff's legal residence was in Many Farms and Shiprock, two places where Plaintiff lived with his wife and his three children in their mobile home while Plaintiff attended school, worked as a silversmith, and taught at the college. Plaintiff's daughter even attended school in Many Farms for four years. (*Id.*) Evidence of Plaintiff's full-time residence at his mobile home in Many Farms and Shiprock controverts his claim of residence at Justin Lewis's home on HPL.

These inconsistencies and conflicts in the record are all specific, cogent reasons for discrediting Plaintiff's testimony. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (holding that an adjudicator may consider "inconsistencies in testimony" in making a credibility determination); *Kaur v. Gonzales*, 418 F.3d 1061, 1064 (9th Cir. 2005) (holding that minor inconsistencies that go to the heart of an applicant's claim support an adverse credibility finding); *see also Tso*, 2019 WL 1877360, at *6. Where there are conflicts in the record, the IHO is tasked with assessing credibility and resolving the conflict between Plaintiff's testimony and other evidence in the record. *Shaibi v. Berryhill*, 883 F.3d 1101, 1109 (9th Cir. 2017) (citing *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999)) (noting that it is a "fundamental principle than an agency, its experts, and [hearing officers] are better positioned to weigh conflicting evidence than a reviewing court"). Plaintiff may disagree with how the IHO considered the evidence, but the Court finds that the IHO had sufficient reasons to deem Plaintiff's testimony regarding his visits to HPL not credible. The IHO's decision is supported by substantial evidence and comports with applicable agency regulations.

**B. The IHO's Residency Determination Is Supported by Substantial Evidence and Is Not Arbitrary and Capricious**

Plaintiff contends that the IHO erred in his residency determination because Plaintiff meets the "temporarily away" exception of legal residence. (Doc. 16 at 11–16.) Plaintiff argues that he "left his HPL home and resided in various places for military service, education, and employment, yet his testimony and that of his witnesses shows that due to familial ties, responsibilities, and cultural heritage, he maintained the family homesite as his legal residence." (*Id.*)

The Court finds that the IHO's decision was rational, in accordance with applicable regulations and policies, and supported by substantial evidence. First, the IHO found the Plaintiff was not a legal resident of HPL on December 22, 1974. The IHO considered relevant factors and articulated a rational connection between his findings and his decision. The IHO highlighted that, in 1973, Plaintiff purchased a mobile home for his family and placed it Many Farms, not on the HPL. On December 22, 1974, Plaintiff lived in the mobile home in Many Farms with his wife and three children. At that time, Plaintiff was attending college full-time in Many Farms. After he graduated college in 1975, Plaintiff temporarily returned to his family homesite to help his grandmother but then moved his nuclear family and their mobile home to Shiprock, New Mexico, in 1976, where Plaintiff began working as a silversmith and later as a teacher.

The record also indicates that Plaintiff's connection to livestock on HPL diminished because a significant portion of the family's livestock was sold off in 1974 as part of the Livestock Reduction Program. Further, any need to help his grandmother with her livestock would have taken Plaintiff to NPL—not HPL—where his grandmother was enumerated. The IHO also examined evidence of Plaintiff's state of mind, given that "residence" depends on an "intent to reside." The IHO noted that Plaintiff's self-identification as a White Cone chapter resident both on his Application for Relocation Benefits and in a Youtube video controverted his claim of residing at a residence within the Teesto chapter.

The Court finds that all these factors reflect Plaintiff's manifestation of intent to

maintain a residency, which the IHO was required to consider. *See* Fed. Reg. 22,277–78 ("'[R]esidence' . . . requires an examination of a person's intent to reside combined with manifestation of that intent."). The IHO reasonably connected these facts to his determination that Plaintiff manifested an intent to reside in Many Farms, not HPL. There was more than a mere scintilla of evidence to support a finding that Plaintiff's legal residence was not on HPL.

Nevertheless, Plaintiff emphasizes that while he was away for school and work, he maintained a strong relationship with his familial homesite and continued to visit the homesite. Although the record reflects Plaintiff's visits to his family's homesite, it also shows that Plaintiff spent a substantial amount of time away from the HPL homesite starting in 1966. Plaintiff effectively moved away from HPL that year when he was drafted into the army. And after he was discharged in 1968, Plaintiff lived in Shiprock with his wife until around 1973, then in Many Farms until 1975, before moving back to Shiprock in 1976. Any time spent at HPL appears irregular, temporary, and primarily for social purposes. *Barton v. Off. of Navajo & Hopi Indian Relocation,* No. CV-22-08022-PCT-SPL, 2023 WL 2991627, at *3 (D. Ariz. Apr. 18, 2013) (holding that visits "limited to ceremonies and social interaction with family members" are insufficient to establish residency under the temporarily away policy).

The touchstone of the "temporarily away" exception is "substantial, recurring contact" with the claimed residence on HPL. Evidence that may indicate "substantial, recurring contact" is a plaintiff having his nuclear family reside at a residence on HPL, using the address of his HPL residence, or keeping his livestock on HPL. *See e.g.*, *Akee v. Off. of Navajo & Hopi Indian Relocation*, 907 F. Supp. 315, 319–20 (D. Ariz. 1995) ("In *Peggy Bex Bolszio*, the claimant had substantial recurring contacts with her traditional home in Jeddito because she changed her residency back to Jeddito, her young children permanently resided at her mother's house there, and she used her mother's address."). Here, Plaintiff has not pointed to any evidence—outside of social, family visits—establishing that he has a substantial and recurring connection with HPL.

Plaintiff's nuclear family, his mobile home, and his employment were all away from the HPL. If, as Plaintiff claims, he was temporarily away for college, it would be reasonable to expect Plaintiff to move his nuclear family and mobile home back to HPL after graduation. Yet, that did not happen. Rather, after a temporary stint back home, Plaintiff moved his nuclear family and mobile home to Shiprock where he established full-time employment, first working as a silversmith and later as a teacher. The record shows that Plaintiff's connection to HPL was primarily for social purposes—so that he may participate in ceremonies and visit family. This is insufficient for temporarily away status. *See Akee*, 907 F. Supp. at 319 (holding that plaintiff did not qualify for "temporarily away" status because plaintiff's trips were for visitation of family purposes, not for the purpose of maintaining a legal residence there).

In sum, the Court finds that Plaintiff has failed to establish that ONHIR's decision denying him relocation benefits is arbitrary, capricious, or unsupported by substantial evidence. The IHO considered relevant factors and articulated a rational connection between his findings and his residency decision, which was supported by substantial evidence. Accordingly, the Court affirms ONHIR's denial of relocation benefits.

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 16) is denied and Defendant's Cross-Motion for Summary Judgment (Doc. 19) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly and terminate this case.

Dated this 17th day of October, 2023.

Douglas L. Rayes
United States District Judge